```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x
 UNITED STATES OF AMERICA         :
                                  :
          - v. -                  :
                                  :  S2 13 Cr. 600 (ER)
 GARY RAMIS,                      :
                                  :
                  Defendant.      :
                                  :
- - - - - - - - - - - - - - - - - -x
```

**GOVERNMENT'S SENTENCING MEMORANDUM**

 

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Emil J. Bove III
Jennifer E. Burns
Rahul Mukhi
Assistant United States Attorneys
    -Of Counsel-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x
  UNITED STATES OF AMERICA    :
                                         :
          - v. -                 :
                                         :  S2 13 Cr. 600 (ER)
  GARY RAMIS,                      :
                                       :
              Defendant.  :
                                       :
- - - - - - - - - - - - - - - - - x

       The Government respectfully submits this memorandum in advance of the defendant's sentencing, which is scheduled for August 15, 2014 at 10:00 a.m. For the reasons set forth below, the Government respectfully submits that a sentence within the applicable Guidelines range is appropriate.

## **BACKGROUND**

**I. The Offense Conduct**

       Prior to joining the drug trafficking organization at issue in this case (the "DTO"), Ramis ran his own marijuana distribution operation, which also involved cross-country transportation of drugs and drug money. Ramis aligned with the DTO after co-defendant Paul Presta and others targeted him for an extortion based on a marijuana-related debt.[1] Rather than acquiescing in the demands of his would-be assailants, Ramis settled the dispute by joining forces with Presta and the DTO.

---

[1] (See Gov't Sentencing Mem. at 2-3, United States v. Presta, 13 Cr. 600 (ER) (dkt. no. 68)).

Because Ramis' affiliation with the DTO and his co-conspirators was borne out of mutual respect for threats and the use of violence, it is no surprise that Ramis frequently possessed a gun, participated in acts of armed violence, and even tracked and threatened a federal agent.

**A.  Ramis' Background and History**

Beginning in at least 2009, Ramis worked with others to transport marijuana and drug proceeds across the country using trailers that contained secret compartments (referred to as "traps").  As part of this activity, Ramis was in direct contact with individuals in California who were operating a grow house in which they stored large quantities of marijuana.  At one point, Ramis observed approximately 600 pounds of marijuana on the premises.  He eventually rented an apartment in San Francisco in order to conduct the transactions and store some of the marijuana, using tools such as a heat sealer to close large plastic bags filled with drugs.  Between approximately 2010 and 2012, Ramis traveled to California every six to eight weeks in order to pick up large loads of marijuana and help drive the drugs back to New York inside the trap of one of his trailers.

In October 2011, two of Ramis' relatives were arrested in connection with the activities of his former marijuana-

trafficking organization.  On October 11, 2011, Ramis flew from New York to San Francisco on a commercial flight.  On October 15, 2011, Ramis' son-in-law (and co-defendant in this case) Kyle Morin was arrested in Des Moines, Iowa while towing a trailer that contained:  $180,000 in drug proceeds belonging to Ramis, clear plastic bags used to store marijuana (that were empty at the time of the arrest), and a motorcycle registered in Ramis' name.  On October 24, 2011, Ramis' ex-wife was arrested in Reno, Nevada while towing a trailer with a trap that contained approximately 248 pounds of Ramis' marijuana.  On November 19, 2012, in the District of Nevada, Ramis' ex-wife pleaded guilty to a superseding information charging her with being an accessory after the fact---in violation of Title 18, United States Code, Section 3---to a violation by Ramis of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B).  (See United States v. Ramis, 11 Cr. 127 (D. Nev.) (dkt. no. 27)).

**B.  The Marijuana Distribution Conspiracy**[2]

Between approximately February 2012 and May 2013, Ramis worked with co-defendants Presta, Mark Lucente, and

---

[2] The description of the DTO set forth herein is taken nearly verbatim from the Government's Sentencing Memorandum in United States v. Presta, 13 Cr. 600 (ER).

3

Michael Rizzo, among others, to facilitate the DTO's transportation of marijuana from the west coast to the east coast for further distribution. The DTO used express mail and planes, among other methods, to move the drugs. (See July 24, 2014 Presentence Investigation Report ("PSR") ¶¶ 19, 27).[3] In approximately 2012, however, a cooperating witness referred to in the PSR as "CW-1" infiltrated the DTO. (PSR ¶¶ 17-18). Lucente had previously provided CW-1 with about a pound of marijuana on consignment, but by February 2012 Lucente offered to provide CW-1 with larger wholesale quantities of marijuana. (Id.). In March 2012, as the DTO's capacity to transport and distribute narcotics increased, Lucente offered CW-1 a stake in a 300-pound load of marijuana. (PSR ¶ 20).

The DTO stored its marijuana in various facilities on Long Island, including in Ramis' basement. In October 2012, the DTO held a meeting in that basement with CW-1 and others, during which CW-1 saw the marijuana stored in vacuum-sealed bags. (PSR ¶ 21). The DTO also operated growhouses on Long Island. (PSR ¶ 28). In March 2013, Lucente described the DTO's budding

---

[3] The revised PSR and the sentencing recommendation of the Probation Office were not available at the time of this submission.

growhouse operations to CW-1, noting that the drugs would not be ready for harvest until August 2013. (PSR ¶ 27). That harvest never happened, however, as Ramis and his co-defendants were arrested before the crop matured.

C.  **Ramis' Firearm Possession**

Ramis often possessed a gun in connection with his work on behalf of the DTO and in the presence of his co-conspirators. For example, in the fall of 2012, a co-conspirator ("CC-1") reported to the group that an individual had forced him to sign over the title to his car in order to pay for personal-use quantities of narcotics. Ramis (who was armed at the time) and others assaulted the individual, only to learn after the attack that CC-1 had lied about the circumstances of the title transfer. When Ramis learned of CC-1's lie, he confronted CC-1 and threatened him by placing a gun in his mouth. (See PSR ¶ 61).

D.  **The Robbery of a Cocaine Dealer in California**

As the DTO's marijuana-distribution operation expanded, the co-conspirators branched out into other forms of violence. In approximately 2012, for example, Ramis set up a cocaine dealer ("Victim-4") for a robbery in California by other members of the DTO. Specifically, Ramis purported to negotiate

a multi-kilogram cocaine transaction with Victim-4 and agreed to pay Victim-4 approximately $300,000 in a hotel room in California. Based on information from Ramis, Rizzo and a co-conspirator ("CC-2") forced entry into the hotel room while possessing either firearms or stun guns, restrained Victim-4 and Ramis, and removed the cocaine and the cash from the room.

**E. Ramis' Tracking of a Federal Agent**

In October 2012, federal agents interviewed one of Ramis' co-conspirators ("CC-3") after CC-3 reported that he had received threats of violence based on a drug debt. At the meeting, one of the agents provided CC-3 with telephone numbers at which the agent could be reached. During the course of this investigation, the Government learned that CC-3 provided the agent's telephone numbers to Ramis and Presta, who took steps to obtain other personal information relating to the agent. The Government believes that Ramis ultimately obtained the agent's home address, apparently by accessing one or more restricted law enforcement databases. When Ramis was presented following his arrest in this case on August 21, 2013, he commented to the agent in question that the agent "did not look old enough to have a teenage son."

6

**II. The Defendant's Guilty Plea**

On April 11, 2014, the defendant pleaded guilty, pursuant to a plea agreement, to a marijuana-distribution conspiracy, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(B). (PSR ¶¶ 7, 8). In the plea agreement, the parties stipulated to the application of enhancements under the Guidelines based on possession of a dangerous weapon and use of violence, a Criminal History Category of II, and an applicable Guidelines range of 78 to 97 months' imprisonment. (Id. ¶ 8).

**III. The Defendant's Criminal History**

The defendant's prior convictions include: (i) conspiracy to receive stolen goods (specifically, two stolen vehicles) in 1997; (ii) fraudulent use of identification in 2005; (iii) reckless endangerment in November 2013; and (iv) false personation in December 2013. (PSR ¶¶ 81-88). As a result of these convictions, the defendant has five criminal history points and is in Criminal History Category III. (Id. ¶ 90).[4]

---

[4] The criminal history calculated in the parties' plea agreement omits the defendant's December 2013 conviction for false personation. (See PSR ¶¶ 8(h), 87). The omission resulted from the fact that the parties calculated

**IV. The Applicable Guidelines Range**

The Probation Office concurs in the parties' stipulated offense level of 27 under the Guidelines. (PSR ¶¶ 8(g), 77). Based on the corrected Criminal History Category of III, the applicable Guidelines range is 87 to 108 months' imprisonment. (Id. ¶ 135). However, pursuant to the current policy of the Department of Justice that a two-level downward variance is generally warranted from the offense level specified in Section 2D1.1(c) of the November 1, 2013 version of the Guidelines manual, the Government respectfully submits that the defendant should be sentenced as though the applicable Guidelines range is 70 to 87 months' imprisonment.[5]

---

the criminal history score set forth in the plea agreement before the defendant was convicted in that case, and did not revisit the issue of the defendant's criminal history prior to the entry of this April 2014 guilty plea in this case.

[5] Without citation to authority, the defendant asks the Court to "consider resentencing" the defendant "if the [Smarter Sentencing Act] is eventually passed" or, in the alternative, to "withhold its filing of the judgment." (Def. Mem. at 9). The Government opposes these requests.

**DISCUSSION**

The balancing of the Section 3553(a) factors with respect to the defendant and his offense conduct merits a term of incarceration within the applicable Guidelines range.

Gary Ramis made a living for years through drug trafficking and violence. It appears that Mr. Ramis deployed his self-described "business savvy" and "career success" in support of a criminal livelihood. (Def. Mem. at 2). Indeed, he reported no legitimate employment post-2010 to the Probation Office, and the 2010 employment that he disclosed involved "consulting" for which he provided no information regarding income. (PSR ¶¶ 127-130).

The defendant's background and history includes a pre-2012 cross-country marijuana business.[6] In connection with that enterprise, the defendant maintained a series of trailers outfitted with traps that were used to secrete large quantities

---

[6] When Ramis discussed some of these activities with the Probation Office, he stated that his ex-wife's conviction in Nevada was "unrelated" to this case. (PSR ¶ 18). His claim is refuted by the terms of the charging instrument to which she pleaded guilty in November 2011, which refers to him by name. This lack of candor further illustrates why the defendant is worthy of a Guidelines sentence.

of drugs and drug proceeds as they were transported between California and New York.

Notwithstanding the arrests of two of his relatives in October 2011 in connection with those activities, the defendant joined the DTO at the center of this case in 2012. The airline ticket purchased for Rizzo in the name of Ramis' girlfriend illustrates that Ramis continued to use those close to him in connection with his crimes. (See PSR ¶ 24). Ramis also used his basement in Long Island as a storage facility for the DTO. In February 2013, he and his co-conspirators began to invest in a larger warehouse that was in close proximity to Ramis' home so that he could manage it. (See PSR ¶ 22).

Ramis' decision to join the DTO reflected a conscious effort on his part to enhance his criminality. Put simply, the DTO was a more sophisticated marijuana-trafficking enterprise than the one that Ramis had run himself. Rather than driving trailers, Ramis and his co-conspirators flew across the country---often using private jets---to transport hundreds of pounds of marijuana to New York for further distribution.
The escalation in Ramis' criminal conduct is also illustrated by the violence in which he participated with other members of the DTO. He possessed weapons, at least one of which he forced into

someone's mouth as a threat.  He also took steps to obtain personal identifying information relating to a federal agent and made a veiled threat to that agent on his way to court, and he targeted at least one other drug dealer in California for a robbery.  On the whole, the defendant's course of conduct warrants substantial punishment.

In an attempt to avoid this reality, Ramis breaches his plea agreement by seeking a downward departure related to his criminal history under U.S.S.G. § 4A1.3.  (See Def. Mem. at 7).  His argument is meritless under the Guidelines and Section 3553.  In 1997, the defendant was convicted of, inter alia, conspiracy to receive stolen goods under North Carolina law.  (PSR ¶ 81).  The convictions related to the defendant's possession of two stolen vehicles, and his submission of false applications to register those vehicles.  (Id. ¶ 82).  The defendant was sentenced to an indeterminate term of incarceration of six to eight months, and he subsequently violated his probation by absconding from supervision in 1999.  (Id. ¶ 81).  Although the defendant did not receive criminal history points based on these convictions and his subsequent violation, his behavior demonstrates a lack of respect for the law and risk of recidivism that was borne out by his subsequent

convictions beginning in 2005.  In connection with the defendant's March 2012 arrest, he abused both alcohol and unspecified narcotics and also possessed amphetamine.  (See PSR ¶ 86).  In August 2012, the defendant committed another crime.  (Id. ¶ 87).  The resulting Criminal History Category of III accurately reflects a man who was undeterred by state-law convictions in 1977, 1997, and 2005, such that he was arrested twice within a span of six months in 2012.

The other personal characteristics cited by Ramis are not sufficiently mitigating to support the imposition of a non-Guidelines sentence.  The defendant's claims of medical issues are largely undocumented, and the ailments of which he complains are not on the same order of magnitude as the brain aneurism, cancer, kidney disease, and neuro-muscular disease at issue in the cases he cites.  (See Def. Mem. at 6).  Finally, the defendant and Paul Presta are not similarly situated.  Presta pleaded guilty to offenses without mandatory minimum sentences, pursuant to a plea agreement without violence enhancements.  At sentencing, Presta identified a host of mitigating considerations that are not present in this case.  And the nature of Ramis' lengthy criminal background and prior convictions, as well as his own violent conduct, warrants a

significantly higher sentence than the one that Presta received.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the aims of sentencing would be achieved through the imposition of a sentence within the applicable Guidelines range.

Dated:    New York, New York
           August 8, 2014

Respectfully submitted,

PREET BHARARA
United States Attorney

By: _____
Emil J. Bove III
Jennifer E. Burns
Rahul Mukhi
Assistant United States Attorneys

## Certificate of Service

The undersigned attorney, duly admitted to represent the United States before this Court, hereby certifies that on the below date, he caused the Government's Sentencing Memorandum to be served on counsel for the defendant via ECF and email.

Dated:   New York, New York
         August 8, 2014

                              Respectfully submitted,

                              _____
                              Emil J. Bove III
                              Assistant United States Attorney